Judge Cabell.
The appellant was a slave in Maryland, and was purchased there as such by the appellee, but now claims her freedom under the second section of our act of assembly, passed the 17th of December, 1792,(a) which establishes, as a general rule, “that slaves, which shall hereafter be brought into this commonwealth, and kept therein one whole year, or so long, at different times, as shall amount to pne year, shall be free.”
It being admitted by the parties that thé appellant has been brought into this state since that law took effect, it is obvious that her right to freedom is thereby established, unless the appellee can show that this case comes within some of the exceptions contained in the act of assembly. He relies, for this purpose, on the 4th section, which declares “ that nothing in this act contained shall be construed to extend to those who may incline to remove from any of the XJnitéd States, and become citizens of this, if, within sixty days after such removal, he or she shall take” a certain oath therein prescribed.
But it is evident that the privilege conferred by this clause, of bringing'slaves into this commonwealth, can be claimed by those persons only, who, at the time of their removal, were citizens, not of this, but of some other state, and as it is admitted that the appellee was a native of this state, the question arises, "whether he had laid aside the character of citizenship thereby acquired, so as to entitle himself to the benefit of this proviso.
Nature has given to all men the right of relinquishing the society in which birth or accident may have thrown *397 them; and of seeking subsistence and happiness elsewhere j and it is believed that this right of emigration, or expatriation, is one of those “ inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive, or devest their posterity.’(a) But, although municipal laws cannot take away or de- , . . , , , , stroy this great right, they may regulate the manner, and • prescribe the evidence of its exercise; and, in the absence of the regulations juris positivi, the right must be exercised according to the principles of general law. As we have no act of congress on this subject, and as doubts are entertained whether our act of assembly concerning expatriation is still in force; or, admitting it to be in force, whether it was ever intended to apply to the case of a citizen of Virginia, removing to, and becoming a citizen of, some other of the United States, I shall, in considering M'Cartjs citizenship, confine myself to the principles of general or universal law : and I am clearly of opinion, that, even according to those principles, his removal from this state, under the particular circumstances of this case, would not amount to an expatriation. A temporary absence will not devest a man of the character of citizen, or subject of the state, or nation to which he may belong. There must be a removal with an intention to lay aside that character, and he must actually join himself to some other community.(b) The intention to abandon this state is not proved by any other evidence than the declarations of M'-Carty himself; and, although this is one of those cases in which a man’s own declarations will be received in his favour, yet, in the present instance, they are contradicted by his own acts, and thereby lose all their weight; for he left his property behind him, and continued to exercise the most important right of a citizen of this state, by voting at the election of the representatives of the people. I do not mean to say that a citizen of this state cannot become a citizen of another state, without carrying his property with him ; *398 ^or’ although that would be required according to the principles of general law,(a) it is dispensed with under our part}cu|ar system, which provides that “ citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.”(b) I have mentioned the circumstance of his leaving his property, to show, with the aid of other testimony, that he did not 3ntend to cease to be a citizen of this state. But, although the constitution of the United States has wisely given to a citizen of each state the privileges of. a citizen of any other state, yet it clearly recognises the distinction between the character of a citizen of the United States, and of a citizen of any individual state; and also of citizens of different states; and, although a citizen of one state may hold lands in another, yet he cannot interfere in those rights, which, froth the very nature of society and of government, belong exclusively to citizens of that state. Such are the rights of election and of representation; for they cannot be imparted to any but citizens, without a subversion of the principles of the social compact. When, therefore, I perceive MiCarty in the exercise of those rights, I am disposed to consider it as rightful, rather than wrongful; which, however, can only be on the idea that he has not relinquished his citizenship. But, admitting him to have intended to abandon this state, he has not executed that intention by attaching himself to another. He made no settlement; he paid.no taxes; in fact, he claimed none of the rights, and performed none of the duties, of a citizen of Maryland. He was “ a mere sojourner in the land,” retaining his character of citizen of Virginia, and, therefore, not entitled to the benefit of a proviso, which, from its very terms, is applicable to those persons only who are not citizens. If mere residence in another state, by a citizen of this state, residence undefined as to object, intention, or duration, shall entitle him, on ■ his return, to bring with him as many slaves as he may think propers *399 how vain and nugatory is the law which affects to prevent their farther importation.
I wish it to be distinctly understood, that my opinion that MiCartif never ceased to be a citizen of Virginia, and that, therefore, he could not bring his slaves with him on his return, has not been influenced by the circumstance of his having failed to comply with the requisites of our act of assembly concerning expatriation. The view I have taken of the subject has rendered any consideration of that act totally unnecessary. My opinion is founded solely on the impression that, according to the principles of general law, there is not sufficient evidence to prove, 1st. His intention to quit this state; and, 2d. The execution of that intention by his departing out of this commonwealth, and becoming a citizen of Maryland. Had there been sufficient evidence on these points, it might then have become necessary to inquire, whether he ought not, nevertheless, to be considered as a citizen of this state, inasmuch as he had omitted to relinquish that character in the manner prescribed by our act concerning expatriation.(a) But we should have been there met by the previous and important question, whether, as the principal part of that act is taken up in declaring the mode in which aliens may become citizens, the particular part relating to expatriation was not intended to point out the mode in which citizens might become aliens: and if so, whether that act can be made to apply to the case of a citizen of Virginia, who leaves this state and becomes a citizen of some other of the United States; the citizens of the other states, although contra-distinguished from citizens of this state, not being aliens with respect to this state, inasmuch as both the articles of confederation, and the constitution of the United States, entitle them to the privileges and immunities of citizens of this state. If arguments drawn from the long and uniform practice of a country are ever allowed to have any influence on a question concerning the con *400 struction óf its laws, they might here be urged with much force. For, of the innumerable emigrants from Virginia, who have overspread the southern and western states and territories, and filled their highest offices, it is believed that not one has ever deemed it necessary to conform to our act concerning expatriation. Are they still citizens of this state? But we should also have to encounter another previous question. Admitting it to have been the intention of our legislature to give to our act of assembly the most extensive application; does the power to regulate the right of expatriation still belong to the state governments, or does it belong to congress, as incident to the power of naturalization, the power of declaring who shall be citizens? I give no decided opinion upon either of these important questions ; but I deem it not improper to state it as my present impression, that, if a citizen of Virginia shall have departed out of this commonwealth with an open and avowed, fair and bona fide intention of quitting it, and of becoming a citizen of some other state, and shall, in fact, have become a citizen1 thereof, that, from thenceforth, he ceased to be a citizen of Virginia, notwithstanding he may, have omitted to comply with the requisites of our expatriation act: and that, should he thereafter be “ inclined to remove” from his newly adopted state, and again “ become a citizen of this,” he will be allowed to bring his slaves with him, “ if within sixty days after such removal” he shall take the oath prescribed by law.' But as to the particular case now before the court, McCarty never ceased, on any principle, to be a citizen of Virginia, and had no right to bring slaves into this state. The appellant, Nancy Murray, was, therefore, brought here contrary to law, and having been kept here one whole year, is entitled to her freedom; and the county court ought so to have instructed the jury. I am, consequently, of opinion that both judgments be reversed, and that the cause be remanded to the county court for a new trial to be had. *401 therein, with directions to the court, to instruct the jury accordingly.
Judge Roane.
It was decided by the supreme court of the United States, in the case of Scott v. Negro London, (3 Cranch, 324.) that the removal by the master, and the importation of the slave, need not be cotemporaneous and concomitant. I am inclined to concur in that construction of the act in question: but that point is not necessary to be now decided in the view I have taken of the subject.
The next question is, whether the appellee is a person coming within the meaning of the proviso of the act upon this subject.(a) That act declares, that slaves thereafter brought within the commonwealth, and remaining there one whole year, shall be free : to which penalty upon the importer, is added another of a pecuniary nature. The object of the law was, to prohibit the great political evil of introducing more slaves into the commonwealth : but as this prohibition, extended to all possible cases, might be too rigid, and as it was also a favourite policy with the legislature to increase the number of our citizens, the genei-al object of the law was relaxed and given up, in consideration of the latter benefit, in favour of the persons, and under the circumstances, embraced by that proviso. That proviso, however, does not extend to those who are already citizens of this commonwealth. I infer this, 1st. Because that idea is reprobated by the limitation, in the proviso, to those who shall “ remove” from any of the United States, “ and become citizens of this and, 2d. Because, in the latter part of the same proviso, the case of “ citizens of this commonwealth” is taken up, and the privilege of importation is confined, as to them, to slaves then owned by them, in any of the United States. This provision defines the extent of the privilege of citizens of this commonwealth in this particular; not only by reason of the *402 imperious words of the first part of the proviso before mentioned, but also from the rule of construction, as applied to the last, that expressio unius est exclusio alterius. This construction results from the express provisions of the act itself; but, were it necessary, we might. ,in addition, well suppose, that the legislature would discriminate, in this particular, between those who were citizens of this state, (wherever resident,) and those who were not; and considering that the animus revertendi probably existed in the former, (even under any circumstances,) the legislature might well have concluded, that they would not stand in need of such inducements to return to the commonwealth, as those would to remove into it, who had never before been citizens thereof. In the case of Talbot v. Jansen,(a) in the supreme court of 'the United States, it seems to have been held, that, although an expatriation, under our act, was conclusive evidence of an intention to relinquish the right of citizenship, as to the commonwealth of Virginia, and, by-Judge Iredell, (the other judges saying nothing on that point,) was the only evidence of such intention; or, in other words, that a citizen of Virginia cannot expatriate himself therefrom, “in any other manner;” yet that, quoad the United States, a residence in, and even a swearing allegiance to, another country was equivocal; for that a man may, at the same time, enjoy the rights of citizenship in two or more governments, and that, therefore, even under those circumstances, the absent citizen would not be construed to have expatriated himself, or to have renounced forever his intention to return to his country. These considerations entirely justify the omission, by the legislature of Virginia, to extend the invitation in question to her absent citizens also; although, at first view, the reason of the two cases might appear to be the same. The question is therefore narrowed to the single point, whether the appellee had ceased to be a citizen of the commonwealth of Virginia at the. time of *403 tne importation in question : it is not enough that he was a citizen of any, or every other state in the union if he were then also a citizen of Virginia: I mean a citizen of Virginia in a particular and limited sense, as contradistinguished from the general privilege conferred, by the constitution, upon the citizens of each state, in every other state.
That there is both a general and a particular sense in which this relationship of a citizen is contemplated in our country, is evident from the constitution itself, which speaks of “ citizens of different states” (inter alia) in the judicial article; from various acts of congress, and judicial decisions on the same subject; and from the consideration, that a contrary idea would savour too much of consolidation, as throwing out of view the particular sovereignties of which the American confederacy is composed. We are told by Judge Paterson, in the aforesaid case of Talbot v. Jansen, and I entirely subscribe to the doctrine, that the situation of America, in this particular, is new, and may produce new and delicate questions; that we have sovereignties moving within sovereignties ; that allegiance to a particular state is one thing, and that to the United States is another; that a renunciation of the former allegiance does not draw after it a renunciation of the latter; and that a statute of the United States, on the subject of expatriation, is much wanted. If, under the non-existence of such a statute of the United States, the strong facts of a permanent residence in, and swearing allegiance to, another and a foreign country, were deemed equivocal, in that case, and as not necessarily importing an expatriation from the government of the United States, much less will the weaker and more equivocal facts existing in the case before us, be construed to have that effect, in relation to the commonwealth of Virginia; in which state, also, there being a statute upon the subject of expatriation, a noncompliance with the requisitions thereof will proportioa *404 ally weaken the inference of an intention to expatriate. The facts stated in the case before us, at most, show only a temporary residence in Marylandj and, at one time, perhaps an intention oí permanent residence there; but it is not only agreed that the appellee did not expatriate himself from Virginia, in the manner prescribed by our act, but, also, that he neither purchased permanent property in Maryland, nor took the oath of allegiance to that state. This case, therefore, is infinitely weaker than that of Talbot v. Jansen, in which the party was adjudged to be still a citizen of the United States, and that, independently of the strong additional argument derived from the existence of our act concerning expatriation, and the noncompliance, with its provisions, on the part of the appellee.
The foregoing ideas, in relation to the connexion between the United States and the several states, go a great way to justify the idea, (upon which the general assembly undoubtedly proceeded, in the case before us,) of a particular and local citizenship to Virginia, and to the other states; by which, as the case may be, an exemption from the penalties of the act will stand or fall.
Whatever the case may be, as to the concurrence of the powers of the two governments, on the subject of the naturalization of aliens, and however the construction, on that subject, is to be adjusted between the respective governments, on the ground of the principles before adopted from the opinion of Judge Paterson, (if not of the whole court,) in the aforesaid case of Talbot v. Jansen ; it is clear to me, that the commonwealth of Virginia has never delegated to congress the exclusive power to legislate on the subject of the great natural right of expatriation, as relative to this commonwealth. Those topics of legislative power are entirely distinct and unconnected: the one relates to aliens, the other to citizens; the one to rights to be acquired, the other to rights to be abandoned; the one to a political, the other to *405 a natural right. The power of expatriation, in relation to the commonwealth of Virginia, is one with which congress had certainly nothing to do; it is not granted in the instrument of government; and it is a fundamental principle in our system, that each state retains every power, jurisdiction, and right, which is not delegated to the United States by the constitution, nor prohibited by it to the states.(a) While, therefore, the power of letnslating on the subject ol expatriation, from the commonwealth of Virginia, has not been given up, and ought not to have been given up, by Virginia, to the United States ; and while the legislature of Virginia has not presumed to confer this right upon her own citizens, (it being one of paramount authority, bestowed on us by the God of Nature,) it is but a small boon to ask, for the legislature of Virginia, that she should be permitted to set up a criterion of evidence for her courts, determining when, and when only, this right shall be adjudged to have been asserted!
By the standard of our act, therefore, on this subject, this case is to be tested; and I entirely agree with Judge Ieedeíl in opinion, as aforesaid, that a citizen of Virginia cannot expatriate himself therefrom “ in any other manner.”
Of this construction the particular citizens of Virginia cannot complain; 1st. Because it is the act of their oxvn government, upon a subject, undoubtedly within its power and jurisdiction; 2d. Because it is beneficial to all the citizens, that this great right should he placed upon a foundation which excludes all possible doubt as to the validity of its exercise, instead of leaving the matter at large, and carving out an infinity of litigation and uncertainty, in this particular; and, 3d. Because the exercise of that right, under the act, is as free as air, and depends upon volition only. As for the citizens of other states, it is not for them to complain, that privileges are denied to the citizens of Virginia, which are extended to them: privileges, too, which are granted *406 in consideration of benefits conferred by them upon the commonwealth, and which it was not in the power of the other class to confer, they being already citizens of Virginia*
On these grounds, I am of opinion to reverse the judgment of both courts, and render judgment in favour of the appellant, for her freedom.
Judge Fleming.
The subject having been nearly exhausted by my brother judges, my opinion in this important case will be concise.
The 2d section of the act, passed the 17th of December, 1792, “ to reduce into one the several acts concerning slaves, free negroes and mulattoes,” declared in general terms, that “ slaves, which should thereafter be brought into this commonwealth, and kept therein one whole year together, or so long, at different times, as should amount to one year, should be free.” The 4th section of the same act modified this general regulation by certain provisoes, or exceptions. The question then is, has the appellee, McCarty, brought his case within any "of those exceptions ? And I am clearly of opinion that he has not.
The case of Scott v. Negro London, 3 Cranch, 324. (which has been cited and much relied on by the counsel for the appellee,) is essentially different from this case; the great point of distinction being that, in that case, the true owner of the slave was a citizen of Maryland who removed into this state, and within sixty days after his removal, took the oath prescribed by law; and it was decided that his rights were not to be affected by the acts of another person, over whom he had no control, and which were done without his knowledge or consent; whereas in this case, the appellee, McCarty, is, and always has been, a citizen of Virginia, and evidently appears to have endeavoured to evade the provisions of the law.
The judgment, therefore, must be reversed, and entered in favour of the appellant, for her freedom.

 Rev. Code, v. 1. p 186.

 Grot. b. 2. c. 5. s. 24. Puff. b. 8. c. 2. p. 868. Vattel, b. 1. c. 19. s. 220. 223. 225. Virg. Bill of Rights, art. 1.

 Puff. b. 8. c. 11. s. 3. p. 869. Hein. b. 2. c. 230.

 Puff. 868, 869. Vatt. b. 1. c. 19. s. 225.

 Const. of U. S. art. 4. s. 2. Art. Conf. art. 4.

 Rev. Code, v. 1. p. 207. c. 110 s. 5. passed the 23d December, 1792. October Sess. 1783, c. 16. s. 3. Ch. Rev. 213.

 Rev. Code, v. 1. p. 186.

 3 Dallas, 152.

 Amendm. to the Const. art. 12.